IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| TYLER MILLER, | Case No. 3:18-cv-00562-SB |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| STEVE WATSON, | |
| Defendant. | |

**BECKERMAN, U.S. Magistrate Judge.**

Tyler Miller ("Miller") filed this action against Steve Watson ("Watson"), asserting retaliation by a public employer in violation of OR. REV. STAT. § 659A.203. The Court has supplemental jurisdiction over Miller's state law claim under 28 U.S.C. § 1367(a),[1] and all parties have consented to the jurisdiction of a U.S. Magistrate Judge under 28 U.S.C. § 636.

///

---

[1] Although the Court dismissed the federal claim that originally conferred subject matter jurisdiction, the Court has determined that judicial economy, convenience, and fairness support the Court's pendent jurisdiction over the remaining state law claim. See *Schnabel v. BorgWarner Morse TEC*, No. CV 08-04714 R (JTLx), 2008 WL 11336462, at *3 (C.D. Cal. Oct. 6, 2008) (noting that a federal court should consider judicial economy, convenience, fairness, and comity when determining whether to exercise its discretion to maintain supplemental jurisdiction).

PAGE 1 – OPINION AND ORDER

Watson filed a motion for summary judgment on Miller's single claim. (ECF No. 91.) For the reasons explained below, the Court grants Watson's motion.

## BACKGROUND

### I. THE DISTRICT

The Columbia 911 Communication District (the "District") is a "Special District formed under Oregon law, and is the public safety 9-1-1 dispatch center for . . . public safety agencies in Columbia County." (Decl. of Steven Watson ("Watson Decl.") ¶ 2, ECF No. 92.) Watson began working for the District in 1991, and served as its Executive Director until he resigned on April 20, 2017. (*Id.*)

### II. THE MILLER REPORT

In July 2016, Miller began working as a consultant for Pallans & Associates ("Pallans"), the District's radio consultant. (Watson Decl. ¶ 5.) The District amended its contract with Pallans to provide for Miller's consulting services, with the understanding that Miller would invoice Pallans for Miller's services, resulting in Miller working as a subcontractor for the District. (*Id.*) In December 2016, Miller prepared a sixty-two page report (the "Miller Report"), identifying problems with the radio system and recommending various improvements, including replacing Pallans and hiring Miller as a District employee to implement his proposals. (Suppl. Decl. of Tyler Miller ("Suppl. Miller Decl.") Ex. 4, ECF No. 108-4.)

### III. THE DISTRICT'S RESPONSE

On December 22, 2016, the District's board met and discussed the Miller Report. (Watson Decl. ¶ 10.) The board "delegated further action . . . to a subcommittee that included a board member, district employee Nancy Edwards, and [Watson]." (*Id.*) The subcommittee decided not to adopt the Miller Report, and decided to terminate Miller's subcontract with the District. (*Id.*)

PAGE 2 – OPINION AND ORDER

## IV. MILLER'S TERMINATION

On January 20, 2017, Watson sent Miller an email, explaining that he was ending the District's relationship with Miller:

> As far as getting past my opinion and focusing on the mission of C911, we will get past that and we will move forward. You are correct, I do not support your recommendation to be the Radio system manager for C911. I have not changed my mind and I don't see anything coming that will change that. Several incident[s] have led to this decision and it is in our best interest to part ways, while still working to represent our respective agencies. Please make no mistake about my interest in this agency, its systems and our users. I am committed to this project and will continue until I retire. I doubt we will ever be 'done' with the radio system. I appreciate all that you have done for C911, your work has been very valuable. Your work is also not lost, as I do believe that the areas you have outlined are all in need of systematic and professional review. Your report will serve as good outline to work from moving forward. *I have also sent a request to Mark Pallans to terminate our amendment agreement that was dated last July. That amendment requires 30 days written notice.* I do believe your statements below about wanting to have a better system and I agree that it is deserved by all of our users. I will be looking forward to your continued support of our project moving forward.

(Watson Decl. Ex. C) (emphasis added); *see also* Pl.'s Opp'n at 16 ("On January 20, 2017, Watson instructed C911-CD's radio contractor (Pallans & Associates) to terminate Miller."). During a January 25, 2017, meeting with Miller, also attended by Nancy Edwards, Watson "explained to Miller [his] reasons for the District's decision to terminate his consulting subcontract." (Watson Decl. ¶ 12); *see also* Pl.'s Opp'n at 16 ("On January 25, 2017, Watson met with Miller and Nancy Edwards, to tell Miller that he planned to take the project away from Miller.") Watson's reasons for Miller's termination included Watson's "concerns over the manner in which Miller had been communicating with staff, board members, and district vendors." (Watson Decl. ¶ 12.) Watson asserts that it was also clear to him "that Miller did not respect [Watson's] authority, and had no intention of following [his] directions[,]" and "Miller had previously advised [Watson] that he had no intention of working with Pallans." (*Id.*) Watson

PAGE 3 – OPINION AND ORDER

reports that "[b]y the end of this meeting, it was evident that Miller was angered by my comments and the decision I had reached." (*Id*.)

Despite Watson's notice in late January 2017 that the District was terminating Miller's subcontract, the District continued to pay Miller, through Pallans, to finish his work. (Pl.'s Opp'n at 23; Def.'s Reply at 4.) However, on April 2, 2017, Watson sent an email to Pallans, with instructions to forward the email to Miller: "Now that the last of our frequencies have been granted. Please inform Tyler that no further work is authorized and no further payments will be made to him. I am considering March 31st as the [l]ast day that any work is authorized[.]" (Suppl. Miller Decl. Ex. 14 at 1-2.) Pallans forwarded Watson's email to Miller, who did not express any surprise at the news, but rather replied that he would send some materials to Pallans that may be of help to Pallans' continued work with the District, noting "I want to see all this work be successful." (*Id.* at 1.)

## V.    SEXUAL HARASSMENT ALLEGATIONS

During Miller's work for the District, he learned that Watson had allegedly made sexual advances toward and harassed female subordinate employees. (Suppl. Miller Decl. ¶¶ 12-15.) Miller alleges that he first confronted Watson about the misconduct in October 2016, and again in January 2017. (Watson Decl. ¶¶ 8, 18-19.) Watson alleges that before the January 26, 2017, District board meeting, Miller pulled him aside and told him that "he was very angry, and that [Watson] was wrong in discontinuing his role in the radio project[,]" and "Miller then told [Watson] that he knew [Watson] had had an affair with one District employee, and that [Watson] had sexually harassed a second employee." (*Id.* ¶ 13.) Watson asserts that this was the first time that Miller had communicated these allegations to him, and Watson was confident that Miller "was attempting to use this knowledge to get [Watson] to change [his] mind about his status with the radio project." (*Id.* ¶¶ 13-14.)

PAGE 4 – OPINION AND ORDER

Miller alleges that on February 13, 2017, he spoke to one of the victims of Watson's alleged sexual harassment on the phone. (Suppl. Miller Decl. ¶ 15.) She was upset because she said Watson had confronted her that day and tried to intimidate her to keep her quiet. (*Id.*) Watson alleges that on February 13, 2017, Miller raised the sexual misconduct allegations with him again, stating: "you have made this personal for me, now I must make this personal for you." (Watson Decl. ¶ 16.) Watson alleges that Miller warned him that he had only a few days to reconsider his standing on the radio project. (*Id.*)

That night, Miller sent a text message to Watson telling him to stop harassing the victim: "I'm aware you've been harassing [woman's name] with questions about what she'll say. Please leave her alone and stop making it worse. Two days." (Suppl. Miller Decl. ¶ 17; Watson Decl. Ex. D.) Miller asserts that "two days" referred to "a separate discussion point" regarding "outstanding payment[.]" (Suppl. Miller Decl. ¶ 17.) That same evening, Miller called Watson's wife to disclose the sexual misconduct allegations. (Dep. of Tyler Miller ("Miller Dep.") 98:10-22, ECF No. 93-3.) Miller asserts that he never attempted to blackmail Watson with the sexual misconduct allegations. (Suppl. Miller Decl. ¶ 9.)

On February 14, 2017, Watson told District board member Rob Anderson ("Anderson") about Miller's allegations that Watson had engaged in sexual misconduct with subordinates. (Watson Decl. ¶ 17.) The next day, the District's board contacted its counsel, Bullard Law, and asked the law firm to investigate the allegations. (Dep. of Rob Anderson 21:15-23:11, ECF No. 93-4.) In March 2017, Bullard Law conducted a follow-up investigation to provide more information to the board about Miller's actions and motivations. (Decl. of Tyler Miller ("Miller Decl.") Ex. 5 at 1, ECF No. 36-5.) Watson asserts that he did not commission, encourage, or otherwise initiate the follow-up investigation. (Watson Decl. ¶ 19.)

## VI.   *THE SPOTLIGHT* ARTICLE

On March 23, 2017, Watson emailed a reporter at *The Spotlight* newspaper asking to meet over the phone. (Suppl. Miller Decl. Ex. 12.) The following day, *The Spotlight* published an article titled "Columbia 911 director submits resignation Letter," about Watson's resignation from the District, and the article includes a quote from Watson. (Suppl. Decl. of Peter R. Mersereau Ex. 3, ECF No. 121-3.)

On April 28, 2017, *The Spotlight* published an article titled "911 candidate under investigation," detailing Watson's blackmail allegations against Miller. (Decl. of Suzie R. Fujioka Ex. 11, ECF No. 107-11.) Prior to the article's publication, the District had responded to a public records request from *The Spotlight*, and provided it with redacted copies of the Bullard Law investigation reports, but Watson alleges that he did not tip off *The Spotlight* to the existence of the reports, and played no role in the District's release of the reports. (Watson Decl. ¶ 20.)

## VII.   THE OSP INVESTIGATION

Miller also served as a volunteer deputy sheriff for the Clackamas County Sheriff's Office ("CCSO"), but CCSO suspended him when it became aware of the investigation into his alleged misconduct at the District. *See* Dep. of Jeffrey Dickerson 39:4-10, ECF No. 93-6 ("[W]e [then] determined that we would suspend [Miller]."). On March 19, 2017, the Oregon State Police ("OSP"), at CCSO's request, opened an investigation into Miller's alleged blackmail. (Suppl. Miller Decl. Ex. 2A at 1.) The OSP interviewed Watson as part of its investigation, but Watson asserts that he did not encourage or otherwise instigate that investigation. (Watson Decl. ¶ 20.)

///

///

PAGE 6 – OPINION AND ORDER

## DISCUSSION

### I.   STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of that party. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted).

### II.  ANALYSIS

Miller alleges in his amended complaint that Watson engaged in whistleblower retaliation in violation of OR. REV. STAT. § 659A.203, by terminating his subcontract, instigating the OSP investigation, and leaking information to *The Spotlight* newsletter. Watson moves for summary judgment on several grounds, including that Miller's claim is time barred. (Def.'s Mot. at 9-18.)

#### A.    Statute of Limitations

"The applicable statute of limitations for claims asserted under [OR. REV. STAT. §] 659A.203 is one year from the date of the alleged act of retaliation." *Smeenk v. Faught*, No. 1:17-cv-01466-CL, 2019 WL 333545, at *4 (D. Or. Jan. 25, 2019) (citing OR. REV. STAT. § 659A.875(1)); *see also* OR. REV. STAT. § 659A.875 (requiring a civil action alleging an unlawful employment practice to be commenced within one year "after the occurrence of the unlawful employment practice"); *Monico v. City of Cornelius*, No. 3:13-cv-02129-HZ, 2015 WL 1538786,

PAGE 7 – OPINION AND ORDER

at *22 (D. Or. Apr. 6, 2015) (explaining that the "controlling date is that of the adverse employment action, and the Oregon Supreme Court has explained that the statute of limitations period commences with the occurrence of the unlawful conduct itself." (citations omitted)). Miller filed this action on April 2, 2018, and therefore any claims that accrued prior to April 2, 2017, are time barred.

### 1. Termination

Watson argues that the undisputed evidence establishes that Watson terminated Miller via email on January 20, 2017 and then explained his termination decision to Miller in person on January 25, 2017, and therefore Miller's retaliation claim based on his termination is untimely. (Def.'s Mot. Summ. J. at 10). Miller does not dispute the contents of the January 20, 2017 email, nor that Watson informed him on January 25, 2017 that the District was terminating his subcontract, but asserts that he continued to perform work for the District, and the District continued to pay him, until April 2, 2017, and therefore he was not actually terminated until April 2, 2017. (Pl.'s Opp'n at 19.) Miller argues that the date of his termination is a disputed fact, and therefore summary judgment is inappropriate. (*Id.*) The Court disagrees.

It is undisputed that Watson provided Miller with written notice on January 20, 2017 via email that he was terminating Miller's subcontract, and that Watson had just provided the required thirty days' notice of termination to Pallans, the contractor. It is also undisputed that Watson met with Miller on January 25, 2017, to confirm and explain his decision to terminate Miller's subcontract. It is further undisputed that despite the notice of termination, Miller continued working to finish his projects until Watson sent an email to Pallans on Sunday, April 2, 2017, explaining that the District would not authorize any further work by Miller beyond Friday, March 31, 2017. Thus, there is no factual dispute that Watson notified Miller on January 20, 2017 that he was terminating Miller's subcontract, that Watson met with Miller on January

PAGE 8 – OPINION AND ORDER

25, 2017 to discuss the termination, nor that Miller continued working and was paid for his work until April 2, 2017.

The applicable statute of limitations provides that a civil action alleging an unlawful employment practice must be commenced within one year "after the occurrence of the unlawful employment practice[.]" OR. REV. STAT. § 659A.875. Thus, "[t]he statute of limitations for a statutory whistleblowing claim is one year from the date of the allegedly wrongful discharge." *Koster v. Lane Reg'l Air Pollution Auth.*, No. 06-6097-AA, 2008 WL 816680, at *3 (D. Or. Mar. 26, 2008) (applying OR. REV. STAT. § 659A.875, and noting that "the Oregon Supreme Court has explained that the statute of limitations period commences with the occurrence of the unlawful conduct itself" (citing *Huff v. Great W. Seed Co.*, 322 Or. 457, 464-65 (1996))). The Court must determine whether the allegedly retaliatory termination here occurred on the date Watson informed Miller he was terminating the subcontract, or on the date Watson suspended any further payments.

The United States Supreme Court has held, in the similar Title VII context,[2] that a discrimination claim accrues at the time an employer provides notice of termination, and that continued employment does not delay the accrual date. In *Del. State Coll. v. Ricks*, 449 U.S. 250, 252-53 (1980), a state college voted to deny a professor's tenure, but extended him a contract to teach one additional year. The professor filed a Title VII national origin discrimination claim against the college, but the Supreme Court affirmed the trial court's dismissal of the professor's claim as untimely, holding that "the only alleged discrimination occurred—and the filing

---

[2] "Because [Chapter 659A of the Oregon Revised Statutes was] 'modeled after Title VII of the federal Civil Rights Act of 1964, 42 U.S.C. § 2000E *et seq.*, federal cases interpreting Title VII are instructive.'" *Ochs v. Eugene Emeralds Baseball Club, Inc.*, 774 F. App'x 1026, 1027 (9th Cir. 2019) (quoting *Harris v. Pameco Corp.*, 170 Or. App. 164, 176 (2000)).

PAGE 9 – OPINION AND ORDER

limitations periods therefore commenced—at the time the tenure decision was made and communicated to [the professor]." *Id.* at 257; *see also id.* at 258 ("That is so even though one of the effects of the denial of tenure—the eventual loss of a teaching position—did not occur until later."). The Supreme Court rejected the professor's argument that his claim accrued at the conclusion of his one-year contract, finding that "[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." *Id.* at 257 (citing *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977)). The Court concluded that "the limitations period commenced to run when the tenure decision was made and Ricks was notified." *Id.* at 259.

One year later, the U.S. Supreme Court again held in *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981), that the statute of limitations for a discrimination claim (this time under 42 U.S.C. § 1983) began to run when two non-tenured administrators "were notified . . . that a final decision had been made to terminate their appointments[,]" and "[t]he fact that they were afforded reasonable notice cannot extend the period within which suit must be filed." The Supreme Court, citing *Ricks*, reiterated that "the proper focus is on the time of the *discriminatory act*, not the point at which the *consequences* of the act become painful." *Id.* (citing *Ricks*, 449 U.S. at 258); *see also Green v. Brennan*, 136 S. Ct. 1769, 1782 (2016) ("[T]he Court [has] explained that an ordinary wrongful-discharge claim accrues—and the limitations period begins to run—when the employer notifies the employee he is fired, not on the last day of his employment." (citing *Ricks*, 449 U.S. at 258-59, and *Chardon*, 454 U.S. at 8)); *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1059 (9th Cir. 2002) ("As the Supreme Court established in *Ricks* and *Chardon*, the question is when the operative decision was made, not when the decision is carried out.").

PAGE 10 – OPINION AND ORDER

The Ninth Circuit, and district courts therein, have relied on *Ricks* and *Chardon* to hold that employment discrimination and wrongful discharge claims accrue when notice of termination is communicated, not on the last day of employment. *See, e.g.*, *Daniels v. Fesco Div. of Cities Serv. Co.*, 733 F.2d 622, 623 (9th Cir. 1984) ("Based on federal precedent, and on California's reliance on federal law in this area, we agree that the district court correctly determined that the wrongful discharge action accrued when the notification was given . . . , rather than the date when compensation stopped."); *Yongli Zhang v. Univ. of Oregon*, No. 6:18-cv-00232-MK, 2019 WL 7476687, at *8 (D. Or. Oct. 11, 2019) (finding that "Plaintiff's discrimination claims under Title VII and [Or. Rev. Stat.] 659A are time barred" because the university's written denial of tenure "was the operative date for computing the Title VII statute of limitations"), *adopted* 2020 WL 42794 (D. Or. Jan. 3, 2020); *Camarata v. Portland Cmty. Coll.*, No. 3:19-cv-00738-HZ, 2019 WL 4723769, at *3 (D. Or. Sept. 26, 2019) ("Because Plaintiff's claims accrued January 9, 2017—when Plaintiff received notice of his suspension and sustained his injury—and Plaintiff filed this case more than two years later, . . . Plaintiff's § 1983 claims are untimely."); *Gouin v. Clallam Cty.*, No. C06-5247 FDB, 2007 WL 2069903, at *3 (W.D. Wash. July 13, 2007) (finding that employee's discrimination and wrongful termination claims were time barred because "[t]he cause of action accrues and the statute of limitations commences to run, upon notice to the employee of the decision to terminate, even though the employee continues to work for the employer after receipt of the notice").

In a similar case in this district, an employee filed a retaliation claim under OR. REV. STAT. § 659A.203 against the Lane Regional Air Pollution Authority, challenging his termination as retaliatory. *See Koster*, 2008 WL 816680, at *1. Defendants moved for summary judgment, arguing that the employee's claims were barred by the OR. REV. STAT. § 659A.875

one-year limitations period. *Id.* at *3. Defendants argued that the limitations period began to run when they informed the employee they were discharging him, and the employee argued that it did not begin until he received a written denial of his discharge grievance a few months later. *Id.* Applying Oregon law, the district judge found that the defendants "informed plaintiff that he was being terminated on November 8, 2004[,]" which is "the date of the defendants' allegedly unlawful conduct and when the limitations period commenced[,]" and therefore the plaintiff's retaliation claim was time barred under OR. REV. STAT. § 659A.875. *Id.*

      Similarly here, there is no dispute that Watson made a decision in January 2017 that he was terminating Miller's subcontract and he informed Miller of the decision, both in writing and in person. Miller does not allege that Watson's January 20, 2017 email, or Watson's statements during their January 25, 2017 meeting, were equivocal, nor that he expected Watson to change his mind. Rather, Miller argues that his claim did not accrue until he finished his work for the District, but the above authorities require the Court to reject that argument. Accordingly, the Court finds that Miller's retaliation claim accrued in January 2017 when Watson gave him notice of termination, at which time Miller had enough information to file his retaliation claim,[3] and therefore Miller's claim filed on April 2, 2018 is barred by the one-year statute of limitations required by OR. REV. STAT. § 659A.875.

///

///

---

[3] Indeed, the second Bullard Law investigation report, which Miller cites in his response (Pl.'s Opp'n at 3), includes an email that Miller sent to Pallans on March 22, 2017 (i.e., prior to April 2, 2017), in which Miller states that Watson had "turned on" him and "that's when he ended the contract/sent you that termination email" and "[s]o now we have a significant retaliation piece to this[,]" and Miller further disclosed that "I've talked to an attorney and I intend to take legal action if the board doesn't take the right steps to correct what happened." (Miller Decl. Ex. 5 at 26-27.)

PAGE 12 – OPINION AND ORDER

## 2. OSP Investigation and Media Leak

Watson also moves for summary judgment on the ground that the remaining alleged adverse actions—instigating the OSP investigation and the media leak—occurred prior to April 2, 2017, and therefore Miller's claim based on those adverse events is also untimely. (Def.'s Reply at 5.) Miller acknowledges that Watson's alleged instigation of the OSP investigation and his alleged leak to the media "occurred before Miller learned that he was terminated, on April 2, 2017" (Pl.'s Opp'n at 24),[4] but argues that the statute of limitations "did not begin to run until Miller had knowledge of those acts on April 21, 2017." (Pl.'s Opp'n at 19.) However, the discovery rule does not apply to the statute of limitations applicable here. *See Monico*, 2015 WL 1538786, at *22 ("[T]he proper conclusion here is that the discovery rule does not apply to [OR. REV. STAT. §] 659A.875(6)[.]"). Accordingly, Miller's retaliation claim based on the OSP investigation and the alleged media leak is also time barred.

## CONCLUSION

For the reasons stated, the Court GRANTS Watson's motion for summary judgment (ECF No. 91).

**IT IS SO ORDERED.**

DATED this 25th day of September, 2020.

HON. STACIE F. BECKERMAN
United States Magistrate Judge

---

[4] The record evidence also confirms that any actions by Watson to instigate the OSP investigation necessarily would have taken place before April 2, 2017, because OSP initiated its investigation on March 19, 2017. *See* Suppl. Miller Decl. Ex. 2A at 3 ("On or about March 19, 2017 [Dickerson] contacted the [OSP] Superintendent, Travis Hampton, and requested the investigative services of the [OSP] . . . . regarding possible criminal acts of 'extortion' by . . . Miller."). In addition, the only evidence in the record of any contact between Watson and *The Spotlight* is the email dated March 23, 2017 (Suppl. Miller Decl. Ex. 13), and thus there is also no evidence to support a finding that an alleged media leak occurred after April 2, 2017.

PAGE 13 – OPINION AND ORDER